UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IN RE ) | | |
| ) | | |
| LOUIS JONES ENTERPRISES, INC., ) | Bankruptcy No. 10 B 11375 | |
| ) | | |
| Debtor. ) | | |
| ) | | |
| ) | | |
| LOUIS JONES ENTERPRISES, INC., ) | | |
| ) | | |
| Plaintiff, ) | | |
| ) | | |
| v. ) | Adversary No. 10 A 1061 | |
| ) | | |
| UNITED STATES OF AMERICA and ) | | |
| AMERICAN CHARTERED BANK, ) | | |
| ) | | |
| Defendants. ) | | |
| ) | | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW AFTER TRIAL

This Adversary proceeding is a three-way fight between debtor-plaintiff Louis Jones Enterprises (the "Debtor"), the United States of America, and American Chartered Bank ("American Chartered"). In the underlying bankruptcy case, the Debtor had sought to use cash collateral, which was subject to lien claims by both the United States and American Chartered. That motion prompted a dispute over the relative priority of the creditors' liens, so the Debtor filed this Adversary proceeding to determine which creditor had the first priority lien. The Adversary and Debtor's Motion for Use of Cash Collateral were consolidated and heard jointly. After trial, the following Findings of Fact and Conclusions of Law are made and are to be

entered. For reasons discussed below, it is determined that the claim of the United States to priority has been established, and that the Debtor may use cash collateral.

## FINDINGS OF FACT

1. On March 16, 2010, the Debtor filed its Voluntary Petition for relief under Chapter 11 of the United States Bankruptcy Code (the "Petition Date").

2. The Debtor, as Debtor-in-Possession, has continued in possession of its property and no trustee has been appointed in this case.

3. The Debtor provides construction management and architecture and engineering consulting services in and around the Chicago metropolitan area.

**A. Debtor's Tax Liabilities**

4. On various dates between March 2009 and March 2010, delegates of the Secretary of the Treasury made assessments totaling $1,116,583.65 against the Debtor for the withheld employee income and F.I.C.A. taxes, and the matching employer F.I.C.A. contributions, due with respect to wages paid to the Debtor's employees for the periods ending March 31, 2008, through September 30, 2009; and for the taxes due under the Federal Unemployment Tax Act for the period ending September 30, 2009, together with penalties, and interest. (*See* Stipulated Facts ¶ 26; Ex. 43; *cf.* Stipulated Facts ¶¶ 23–24; Ex. 19–20.)

5. Notice of each of the foregoing assessments, and demand for their payment, was sent to the Debtor on or about the date of each assessment. Despite notice and demand, the Debtor did not fully pay the assessments described above. The sum of $1,116,583.65, plus interest and other statutory additions accruing from and after April 8, 2010, remains

due and owing to the United States. (*See* Stipulated Facts ¶ 26; Ex. 43; *cf.* Stipulated Facts ¶¶ 23–24; Ex.19–20.)

6. On June 8, 2009, the United States, through the I.R.S., filed a Notice of Federal Tax Lien with the Illinois Secretary of State asserting a lien on all property and rights to property of the Debtor securing an obligation with an unpaid balance of $148,826.00 ("Initial Lien Notice"). (Stipulated Facts ¶ 22; Ex. 18.)

7. On August 14, 2009, the United States, through the I.R.S., filed a Notice of Federal Tax Lien with the Illinois Secretary of State asserting a lien on all property and rights to property of the Debtor securing an obligation with an unpaid balance of $510,795.69. (Stipulated Facts ¶ 23; Ex. 19.)

8. On February 26, 2010, the United States, through the I.R.S., filed a Notice of Federal Tax Lien with the Illinois Secretary of State asserting a lien on all property and rights to property of the Debtor securing an obligation with an unpaid balance of $298,816.79. (Stipulated Facts ¶ 24; Ex. 20.)

9. On April 8, 2010, the I.R.S. filed a proof of claim in the Debtor's bankruptcy case for the balance due and owing to the United States from the Debtor for unpaid taxes as of the Petition Date, in the amount of $1,116,583.65. (Stipulated Facts ¶ 26; Ex. 43.) This amount included $873,880.07 of secured claims, $234,759.94 of unsecured priority claims, and $7,943.64 of unsecured general claims. (Stipulated Facts ¶ 25; Ex. 43.)

**B. The Debtor's Assets**

10. The federal tax liens associated with unpaid assessments against the Debtor are liens against the Debtor's property, including the Debtor's accounts receivable. As of the Petition Date, the Debtor's accounts receivable had a face value of at least $271,993.70 (the "Petition Date Receivables"). (Stipulated Facts ¶ 28.)

11. $251,728.80 of the Debtor's Petition Date Receivables were not earned or due until after August 6, 2009. (Id. ¶ 29.)

12. The Debtor's Petition Date Receivables arose from obligations evidenced by seventeen invoices, only two of which were sent prior to July 23, 2009 (which was the forty-fifth day following the Initial Lien Notice filing date of June 8, 2009). (Ex. 26–42.) These two invoices are: (1) an April 17, 2009, invoice to ETA Creative Arts Foundation for $5,058.92, and (2) a June 18, 2009, invoice to ETA Creative Arts Foundation in the amount of $15,205.98, totalling $20,264.90. (Ex. 28–29.)

13. The Debtor has obtained additional contracts and interests in joint ventures subsequent to the Petition Date that will result in increased revenues for the Debtor. (Trial Tr. 26: 18–27:6, 28:13–25, June 10, 2010.)

14. The Debtor obtained a 15 % interest in a joint venture that will construct the St. Bernard replacement hospital over the next three-and-a-half years. The Debtor projects that it will net a profit of approximately $600,000.00. (*Id.* at 26:18–22, 34:7–8.)

15. The Debtor has been chosen by City of Chicago to work on the team that will manage the reconstruction of Wacker Drive over eighteen months for a gross revenue of $250,000.00 to the Debtor. (*Id.* at 28:15–25, 59:24–60:2.)

16. The Debtor has been contracted by Teng to manage a year-long construction project of a Metra station at 35th Street. (*Id.* 26:2–14.)

17. The Debtor's revenue from the St. Bernard Hospital joint venture, the Lower Wacker Drive project, and the 35th Street Metra/Teng contract have not been included in the Debtor's prior cash collateral budgets. (*Id.* 32:2–10.)

18. The Debtor is a 10% partner in a limited liability company led by A. Epstein International that is contracted to provide design and engineering services on the construction of the north runway at O'Hare Airport. (*Id.* at 24:7–19.)

19. The Debtor has a renewable contract with Tishman Construction to manage projects for Chicago Public Schools that has been renewed annually for more than thirteen years. (*Id.* at 19:5–16.)

**C. American Chartered Bank Loans**

20. On October 1, 1997, the Debtor executed a Promissory Note in favor of American Chartered in the principal amount of $500,000.00, identified as Loan Number 9001, and later identified as Loan Number 5036046001 (the "1997 Loan"). In connection with the 1997 Loan, the Debtor executed a Commercial Security Agreement, which granted American Chartered a security interest in the Debtor's accounts receivable, among other things. (Stipulated Facts of ¶¶ 2–3; Ex. 2.)

21. The 1997 Loan did not contain a fixed term or specific date for repayment of the principal, but rather contained a demand feature that allowed American Chartered to demand payment at any time. (Ex. 1.)

22. On August 11, 2009, the Debtor executed a Promissory Note in favor of American Chartered in the principal amount of $600,000.00, identified as Loan Number 503604608 (the "2009 Loan"). In connection with the 2009 Loan, the Debtor executed Business Loan Agreement and a Commercial Security Agreement, which granted American Chartered a security interest in Debtor's accounts receivable and other property. (Stipulated Facts ¶¶ 12–14; Ex. 12–14.)

23. American Chartered made the 2009 Loan to the Debtor sixty-four days after the United States filed the Initial Lien Notice. (Stipulated Facts ¶ 27.)

24. The 2009 Promissory Note includes the following provision: "Prior Note. The Promissory Note dated October 1, 1997, in the original principal amount of $500,000.00 from Borrower to Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the Promissory Note." (Ex. 12.) The 2009 Loan documents do not otherwise refer to or further clarify this reference. (*See Id.*)

25. Louis Jones, one of Debtor's principals, testified that the 2009 Loan was not a renewal of the 1997 Loan, but was intended to pay off a prior note. (Trial Tr. 65:12–66:9.)

26. American Chartered allocated the proceeds of the 2009 Loan as follows: $499,295.00 was applied to pay off the 1997 Loan; $98,421.83 was applied to pay off an unrelated American Chartered Bank Loan, Number 87165007; and $2,283.17 remained available for future advances to the Debtor. (Stipulated Facts ¶ 15.)

27. The Disbursement Request and Authorization for the 2009 Loan states that "the specific purpose of this loan is: Payoff existing debt." (Ex. 15.)

28. Similar to the 1997 Loan, the 2009 Loan did not contain a fixed term or specific date for repayment of the principal, but rather contained a demand feature that allowed American Chartered to demand payment at any time. (Ex. 12.)

29. On October 20, 1997, American Chartered recorded a UCC Financing Statement with the Illinois Secretary of State (the "UCC Financing Statement"). (Stipulated Facts ¶ 4.) That UCC Financing Statement included a reference to "All Accounts" of the Debtor. (Ex. 3.)

30. On March 10, 1999, American Chartered amended the UCC Financing Statement. (Stipulated Facts ¶ 5.)

31. On October 8, 2002, and August 8, 2007, American Chartered filed Continuation Statements relating to the UCC Financing Statement. (*Id.* ¶ 6.)

32. American Chartered did not file a UCC financing statement with the Illinois Secretary of State in connection with the 2009 Loan at any time after August 11, 2009. (*Id.* ¶ 16.)

33. In the period between the 1997 Loan and the 2009 Loan, American Chartered entered into additional commercial loans with Debtor, and entered into private loans with Debtor's principals. (*See, e.g.*, Ex. 7–11 (referencing 2002 commercial loan agreement).)

34. On October 6, 2009, American Chartered sent correspondence to the Debtor regarding payoff of the 2009 Loan (referenced as Loan Number 503604608). (Stipulated Facts ¶ 19; Ex. 17.)

35. On March 18, 2010, the balance due and owing to American Chartered under the 2009 Loan was $468,727.40. (Stipulated Facts ¶ 21.)

Additional facts set forth in the Conclusions of Law below should be considered as additional Findings of Fact.

## CONCLUSIONS OF LAW

The ultimate issue is whether the federal tax liens have priority over American Chartered's alleged security interest in the Debtor's Petition Date Receivables. In this regard, it must be decided whether American Chartered is correct in contending that the 2009 Loan was a renewal.

### Jurisdiction

Subject matter jurisdiction lies under 28 U.S.C. § 1334. It is before the Court pursuant to 28 U.S.C. § 157 and is referred here by District Court Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. Venue lies under 28 U.S.C. §§1408 and 1409(a). This Adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (K).

### A. The United States' Federal Tax Liens Have Priority over American Chartered's Alleged Security Interest

If a taxpayer fails to pay a federal tax assessment after notice and demand, a federal tax lien in the amount of the unpaid balance of the assessment arises and attaches to all of the taxpayer's property and rights to property, including after-acquired property. 26 U.S.C. § 6321. "[O]nce the tax lien has attached to the taxpayer's state-created [property] interests . . . federal law . . . determines the priority of competing liens." *Aquilino v. United States*, 363 U.S. 509, 513–14 (1960).

"Federal tax liens do not automatically have priority over all other liens. Absent provision to the contrary, priority for purposes of federal law is governed by the common-law principle that the 'first in time is the first in right.'" *United States ex rel. I.R.S. v. McDermott*, 507 U.S. 447,

449 (1993) (quoting *United States v. New Britain*, 347 U.S. 81, 85 (1954)). Pursuant to § 6323(a) of the Internal Revenue Code, "the filing of notice renders the federal tax lien extant for 'first in time' priority purposes regardless of whether it has yet attached to identifiable property." *McDermott*, 507 U.S. at 453. When competing claims result in simultaneously attaching liens, the federal tax lien has priority. *Id.* at 454.

Under § 6323, certain statutory exceptions to the federal tax lien priority are established for certain security interests. If the 2009 Loan was a renewal of a former loan, then American Chartered's loan can qualify as a "commercial transactions financing agreement" because the original loan was made before the forty-sixth day after the Initial Lien Notice filing date. 26 U.S.C. § 6323(c)(2)(A). However, because the 2009 Loan was issued sixty-four days after the filing of the Initial Lien Notice, if the 2009 Loan does not qualify as a renewal, the federal tax liens assessed in the Initial Lien Notice have priority with respect to the Debtor's Petition Date Receivables.

Even if the 2009 Loan was a renewal and therefore deemed to have been made before the forty-sixth day after the Initial Lien Notice filing date, however, the statute limits this exception to the priority of the tax lien to "qualified property" covered by the terms of a written agreement entered into before tax lien filing and constituting a "commercial transactions financing agreement." *Id.* § 6323(c)(1)(A)(I).

To qualify as a "commercial transactions financing agreement," the agreement must have been entered into in the course of a person's trade or business to make loans to the taxpayer to be secured by "commercial financing security" acquired by the taxpayer in the ordinary course of his trade or business. *Id.* § 6323(c)(2)(A). While American Chartered did not present evidence

specific to the question of whether it makes commercial loans in the ordinary course of its trade or business, the testimony and documents in evidence indicated that American Chartered's business as a bank involves financing commercial transactions, and it is so found. The 2009 Loan by its terms was secured by collateral including Debtor's Petition Date Receivables, and accounts receivable are included in the statutory definition of "commercial financing security." *Id.* § 6323(c)(2)(C).

This commercial financing security is limited, however, only to "commercial financing security acquired by the taxpayer before the forty-sixth day after the date of tax lien filing." *Id.* § 6323(c)(2)(B); *see also J.D. Court, Inc. v. United States*, 712 F.2d 258, 264 (7th Cir. 1983) (a creditor with a valid security interest only has priority in those accounts receivable arising prior to the government's filing of its notice of tax lien, or within forty-five days thereafter). American Chartered has admitted that, with the exception of the two accounts receivable identified in Finding of Fact 12, Debtor's Petition Date Receivables were not earned or due until August 6, 2009, a date more than forty-six days after the Initial Tax Lien Notice. Further, the record contains no evidence of any dates for the arising of Debtor's Petition Date Receivables other than dates of the invoices (or dates of work performed as shown on each invoice). Consequently, even if the 2009 Loan was a renewal and qualified for the exception for commercial transaction financing agreements set forth in § 6323(c) of the Internal Revenue Code, any interest of American Chartered in the Debtor's Petition Date Receivables available to secure that loan prior to the forty-sixth day after the Initial Lien Notice filing date could only have priority over the federal tax liens with respect to the two receivables that arose within the forty-five-day period

following the Initial Lien Notice filing totaling $20,264.00. However, as shown below, the 2009 Loan was not a renewal, so American Chartered must lose even that part of its claim to priority.

**B. The 2009 Loan Was Not a Renewal**

A proof of claim filed in accordance with the Bankruptcy Rules is prima facie evidence of the validity and the amount of the claim. Fed. R. Bankr. P. 3001(f); *In re Hemingway Transp., Inc.*, 993 F.2d 915, 925 (1st Cir. 1993), *cert. denied*, 510 U.S. 914 (1993); *In re Chapman*, 132 B.R. 132, 143 (Bankr. N.D. Ill. 1991). The matters set forth in the claim filed in the Debtor's bankruptcy case by the United States have not been contested. Therefore, the United States has made a prima facie showing that at the Petition Date it had a properly perfected and enforceable lien that attached to all of the Debtor's property and rights to property, including after-acquired property and the Debtor's Petition Date Receivables.

American Chartered asserts that the 2009 Loan was a renewal of the already-perfected 1997 Loan, and that therefore American Chartered's security interest in Debtor's Petition Date Receivables is senior to the federal tax liens (at least as to qualified property under 26 U.S.C. § 6323(c)). In American Chartered's Answer to the Adversary Complaint (First Affirmative Defense) and in American Chartered's Objection to Interim Use of Cash Collateral [Bankr. Docket No. 24] it contends that Debtor was in default on the 1997 Loan and negotiated a "renewal" of that Agreement in August 2009, with result that UCC filings under the 1997 Loan covered this "renewal." (American Chartered Answer (First Affirmative Defense); American Chartered Objection to Interim Use of Cash Collateral [Bankr. Docket No. 24].)

Despite these contentions that the 2009 Loan was a "renewal" of the 1997 Loan, the 2009 Loan paid off the 1997 Loan, which was thereby extinguished. American Chartered never filed a

UCC Financing Statement for the newly created 2009 Loan, and has failed to meet its burden to establish that its lien is entitled to priority over the federal tax lien on the basis of its alleged security interest.

In a bankruptcy hearing under § 363 of the Bankruptcy Code, the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest. *See In re Nat'l Fin. Alts. Inc.*, 96 B.R. 844, 854 n.19 (N.D. Ill. 1989). As the Internal Revenue Service's unchallenged proof of claim is prima facie evidence of the validity and the amount of its claim, American Chartered bears the burden of proving the validity, priority, or extent of its interest, which it has failed to do.

Paying off an initial loan with the proceeds of a new loan, without evidence establishing that the parties intended simply to renew the first loan, is "decisive evidence that the parties have extinguished the first obligation." *Harder v. United States*, Civ. A. No. 91-10513, 1993 WL 667770, at *8 (D. Mass. Aug. 18, 1993). In *Harder*, the Court analyzed whether a 1976 financing statement perfected, as a renewal, a 1984 security agreement—a situation similar to the facts in the instant case—and noted that the transaction documents themselves, not later subjective statements by the parties as to prior state of mind, are dispositive of intent. Id. at *8–9.

American Chartered argues that a single vague reference in the 2009 Loan documents to the existence of the 1997 Loan, and the incorporation in the 2009 Loan documents of "Related Documents" including "all other promissory notes . . . whether now or hereinafter existing or executed in connection with the loan," establish that the 2009 Loan was a renewal. The 2009 Loan documents do not state, however, that the 2009 Loan is a renewal. The full applicable text in the 2009 Loan documents is the following:

> **RELATED DOCUMENTS.** The words "Related Documents" mean all
> promissory notes, credit agreements, loan agreements, environmental agreements,
> guaranties, security agreements, mortgages, deeds of trust, security deeds,
> collateral mortgages, and all other instruments, agreements and documents,
> whether now or hereafter existing, executed in connection with the loan.
> . . .
> **PRIOR NOTE.** The Promissory Note dated October 1, 1997, in the original
> principal amount of $500,000, from Borrower to Lender, together with all
> renewals of, extensions of, modifications of, refinancings of, consolidations of,
> and substitutions for the Promissory Note.

(Ex. 14.)

Conversely, the 2009 Loan Disbursement Request and Authorization did state that the "specific purpose of this loan is: Payoff existing debt." (Ex. 15.) American Chartered not only used $499,295.00 of proceeds of the 2009 Loan to pay off the outstanding 1997 Loan, it also used $98,421.83 to pay off a separate American Chartered loan. This is certainly not a mere renewal of the obligations of a prior loan, but instead comprised a cancellation of prior liabilities based on two separate loans and issuance of the new 2009 Loan.

Terms of the 1997 Loan required payment on demand. There was no evidence that such demand had been made, so the parties to that loan had no necessity to renew it. The purpose of a loan renewal is to grant additional time for payment by extending the payment period or repayment date. *See, e.g., Cmty. Bank of E. Peoria v. Meister Bros.*, 299 N.E.2d 589, 592 (Ill. App. Ct. 1973). The demand note associated with the 1997 Loan, by its terms, did not have a specific payment period. The parties to the 1997 Loan had nothing to renew; the principal on the 1997 Loan only became due if and when American Chartered decided it would be due and made a demand. In the absence of any necessity to renew a prior note, and absence of express language showing the claimed renewal, rather than to initiate a new note, the 2009 demand note cannot be considered a renewal of the 1997 demand note.

American Chartered's own actions are a further indication that the 2009 Loan was a new obligation, the proceeds of which were used to pay off and extinguish the 1997 Loan. On October 6, 2009, when American Chartered declared that the Debtor was in default under the 2009 Loan, American Chartered referenced only the 2009 Loan (Loan Number 503604608) and demanded payment under the 2009 Promissory Note, without any reference to the 1997 Loan or to a "renewal" of a prior obligation.

American Chartered cites *Community Bank of East Peoria, supra*, as support for its contention that the 2009 Loan was a renewal. The situation in *Community Bank*, however, was much different from that in the instant case. In that case, the parties renewed a series of short-term notes (on ninety-day renewals) secured by a ditching machine. *Community Bank*, 299 N.E.2d at 591. The opinion found that the series of notes issued over the course of about sixteen months were "intended by the parties as a single, related transaction in the simplest form." *Id.* at 592. That situation is distinguishable from the loans between American Chartered and Debtor, which were not a single, related transaction spread over many months, but rather were two separate loans made twelve years apart. Most significant, proceeds of the 2009 Loan paid off and extinguished the debt under the 1997 Loan and another separate loan, and then included a small additional amount as a line of credit.

American Chartered has failed to meet its burden to prove that the 2009 Loan was a renewal, and because American Chartered failed to file a UCC Financing Statement in connection with this new loan, American Chartered does not have a valid properly perfected lien in the Debtor's Petition Date Receivables. The 2009 Loan did not come into existence until after

the United States had filed the Initial Lien Notice, so American Chartered's security interest could not have attached to the 2009 Loan prior to the filing date of that lien notice.

**C. Debtor May Use Cash Collateral**

The use of cash collateral may be authorized if the entity that has an interest in such collateral is adequately protected. *See* 11 U.S.C. 363(c)(2). If a debtor's proposed protections preserve the creditor's interest in the cash collateral as it existed on the petition filing date, then the creditor is adequately protected. *See In re Carbone Cos.*, 395 B.R. 631, 635 (N.D. Ohio 2008). "The test [for adequate protection] is whether the secured party's interest is protected from diminution or decrease as a result of the proposed use of cash collateral." *Id.*

Debtor points out that it has developed a strong book of current business. The Debtor also maintains that the United States, or in the alternative, American Chartered, is adequately protected by: (1) a replacement lien in the post-petition accounts receivable and the increased receivables due under the Wacker Drive Project, the St. Bernard Hospital Joint Venture, and the Teng Contract; and (2) monthly payments of $2,145.00. *See* 11 U.S.C. 361(1),(2). Since the United States has not argued that its interest is diminishing, there is no reason not to accept this contention. Further, since American Chartered's interest is found to be subordinate to the United States' interest, and the petition date value of the secured property is no more than $271,993.70, while the United States' secured interest in that is at least $873,880.07, American Chartered's interest is entirely unsecured. *See* 11 U.S.C. § 506(a). Since American Chartered's security interest is without value, it is not diminishing and does not require any adequate protection. Finally, even if American Chartered were entitled to adequate protection, its evidence shows that

American Chartered would be adequately protected. Therefore, the Debtor's motion to use cash collateral will be granted

## CONCLUSION

The IRS tax liens have priority over American Chartered's lien with respect to the Debtor's Petition Date Receivables, and the Debtor's motion to use cash collateral will be allowed, subject to submission of a reasonable budget to be proposed by the Debtor. Orders to that effect will separately be entered.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this 19 day of October, 2010.